**SO ORDERED.**

**SIGNED this 09 day of December, 2010.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:

STEVEN D. KLINGERMAN,    CASE NO: 07-02455-5-JRL
                         Chapter 11
    Debtor
_____

STEVEN D. KLINGERMAN,

    Plaintiff

    v.    ADVERSARY PROCEEDING
                         NO.   L-08-00017-5-JRL
EXECUCORP, LLC and BRADLEY
E. PARKER, Individually and as
Member-Manager of ExecuCorp, LLC,

    Defendants
_____

## ORDER

This matter is before the court upon the motion by Bradley E. Parker (hereinafter "defendant") requesting credits and setoffs flowing from the court's order approving the sale of the debtor's interest in ExecuCorp, LLC (hereinafter "ExecuCorp"). A hearing was held in Raleigh, North Carolina on Thursday, October 21, 2010 to consider the motion.

**BACKGROUND**

The court is very familiar with the facts of this case, as the debtor's bankruptcy and the associated adversary proceeding have been ongoing for over three years and two years, respectively. The relevant facts are presented below.

The debtor-plaintiff ("debtor") is a citizen and resident of Washington County, Oregon, and the defendant is a citizen and resident of Wake County, North Carolina. Before moving to Oregon in 2006, the debtor and defendant were friends, roommates and business associates; the relationship deteriorated as time progressed and events transpired, eventually culminating in this adversary proceeding.

The debtor and defendant first met in 1986. At that time or shortly thereafter, the debtor owned and operated a remodeling and insurance repair business known as Forest Hills Design/Build, Inc. ("Forest Hills"), and the defendant owned and operated a limousine business, Execucoach Limousines, Inc.

In 1997, the defendant looked into purchasing the real property located at 201 W. Martin Street, Raleigh, North Carolina, formerly a Firestone service center. The defendant was considering operating his limousine business from the building at that location and asked the debtor for his feedback on the structural character of the building because of his construction background.

The building had two floors, an "upstairs" and a "downstairs." At that time, the "downstairs" was an unfinished storage area that had no walls or useable office space and consisted of approximately 5,800 square feet. The "upstairs," also approximately 5,800 square feet in size, was partially remodeled with offices and also contained living quarters for Wake County EMS.

While consulting with the defendant on the integrity of the building, the debtor suggested

2

that he and defendant purchase the building together, with use of the property being equally and fairly proportioned between defendant's limousine business and Forest Hills. Each entity would be responsible for 50 percent of the costs associated with operating the property and paying debt service on the loan used to acquire the property.

The defendant agreed, and this partnership took the form of a limited liability company under the North Carolina Limited Liability Company Act. The limited liability company was named ExecuCorp LLC ("ExecuCorp"), and that entity purchased the building.

ExecuCorp's articles of organization were filed with the North Carolina Secretary of State on September 11, 1997, and provided that "all of the members by virtue of their status as members shall be managers of this limited liability company." The defendant and debtor were the two organizers of ExecuCorp, and they were the member-managers. Upon the organization of ExecuCorp, debtor and defendant contributed equal amounts to the initial capital of ExecuCorp, resulting in an initial bank balance of $20,000.00, such amount being attributable to $10,000.00 contributions from debtor and defendant each.

The debtor and defendant also executed an operating agreement for ExecuCorp. The operating agreement was 25 pages long, but contains mostly boilerplate provisions that unfortunately do not address the problems that would arise if and when the two equal managers have a falling out and cannot agree on how to run the corporation, as happened in this case. Although the essence of the arrangement between the two was that the debtor would have the use of the basement and the defendant would have the use of the first floor, there was no written agreement that memorialized that understanding. The terms and conditions of occupancy were not reduced to writing and no written agreement spelled out what would happen if a member does not pay his share of the

expenses.

On September 16, 1997, ExecuCorp acquired the W. Martin Street property from Wake County for a purchase price of $290,250.00, and on that same date executed a deed of trust against the property for the benefit of United Carolina Bank in the amount of $232,200.00 to fund a portion of the purchase price.

Immediately after purchasing the property, Forest Hills and Execucoach occupied the property and paid monthly rents to ExecuCorp. Forest Hills' monthly rent was generally based on 50 percent of the loan payment, taxes, insurance and utilities applicable to the property.

For the first few years, the lack of written leases and the absence of corporate observances did not seem to matter as long as the debtor and defendant were friends. Each owner occupied his respective floor of the building and paid his equal share of the expenses.

On or about March, 1998, ExecuCorp refinanced the United Carolina Bank loan by obtaining a loan in the amount of $280,000.00 from First Citizens Bank, an amount sufficient to satisfy the United Carolina Bank mortgage and also provide cash to ExecuCorp in the amount of $45,461.60. The First Citizens Bank loan was secured with a deed of trust on the property. The debtor and defendant agreed that the initial contribution of $20,000.00 and the proceeds from the First Citizens Bank loan would be used by Forest Hills and Execucoach in equal 50 percent shares to be applied toward upfitting the parties' respective portions of the property and/or monthly rents payable to ExecuCorp.

From this point forward, the relationship between the parties seemed to disintegrate. Between 1999 and 2002, the debtor alleges that his company, Forest Hills, spent approximately $10,000 from ExecuCorp's funds to upfit the building for its use. When Forest Hills' business

4

started to decline in 2002, debtor requested that he be able to use the remainder of his 50% allocation from ExecuCorp's funds to make monthly payments. The defendant informed debtor that there were no funds remaining in ExecuCorp for his use. The debtor alleged that this was the result of defendant spending more than his 50% share of ExecuCorp's funds.

In 2002, Forest Hills ceased operations and moved out of the downstairs portion of the property while the defendant's limousine business continued to occupy the upstairs. After the debtor moved out, the defendant alleged that the debtor entered into a series of leases and agreements concerning the downstairs portion of the property without consulting, or obtaining permission from, the defendant or ExecuCorp. These leases and agreements include the 2003 agreement with Carolantic Realty to sell and/or lease the debtor's portion of the building; the debtor himself moving into his portion of the building in 2004 without paying rent; sharing the downstairs space during that time with a roommate who paid monthly rent to the debtor in the amount of $500; leasing the space to a local band for rehearsal in October 2005 while again receiving, but not paying rent to ExecuCorp; and actively seeking to lease or sell his portion of the building in 2005.

The defendant, however, was not immune from similar charges. The defendant's limousine business moved out of the property in May, 2005 and similarly began leasing the upstairs to third parties. The debtor alleged that the defendant, rather than the LLC, received rents from these third parties.

The debtor, suffering from financial and marital problems, relocated to Oregon in 2006 after receiving a job offer. The debtor continued to pay 50% of the loan payments, insurance, taxes and utilities until October, 2006.

At or about the time debtor moved to Oregon, defendant offered to purchase the debtor's half

of the LLC, based in part on an appraisal commissioned by the defendant. The defendant's offer was for less than one-half the fair market value of the property. The debtor turned down defendant's offer because he still had a positive cash flow from a lessee. That lease was breached in May 2006 however, after which the debtor listed the property (which in reality was the downstairs portion only) for sale on Craigslist. The listing generated two offers to purchase the entire building in October 2006. These offers were rejected by the defendant for various tax reasons.

Instead, the defendant again offered to purchase the debtor's half of the corporation, and received valuations from real estate agents estimating the basement portion at $300,000, or one-third of the estimated overall value of the building. The defendant offered to purchase the debtor's interest in the LLC for this amount in an email in November 2007. The defendant never received a response from the debtor until the defendant received a letter from debtor's counsel in January 2008 explaining that the debtor no longer wanted to participate in management of the LLC but instead wanted the defendant to purchase debtor's interest.

Despite these developments, the defendant was able to secure the following tenants for his portion of the building through February 2009: Execucoach; F.O. Finch III; White Horse Limousines; and Carolina Surgical. The defendant also secured Yancy's Inc. and Visual Advantage LLP as tenants for the debtor's portion of the building. Finally, the defendant secured Barnhill-Balfour Beatty, LLC as a tenant for all the space in the building beginning in March 2009, despite the fact that the tenant did not want to lease the debtor's portion of the building.

The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on October 30, 2007, and on February 11, 2008 he filed a complaint to dissolve ExcecuCorp, LLC, and to recover damages from the defendant for breach of fiduciary duty and for unfair and deceptive trade

practices. In that proceeding, each party filed cross motions for summary judgment and Judge Small issued an order on August 4, 2009 granting summary judgment in favor of the debtor with respect to the dissolution of ExecuCorp, but granting summary judgment in favor of defendant with respect to the claims of breach of fiduciary duty and unfair and deceptive trade practices. In support of his ruling for dissolution, Judge Small noted that the record was "replete with examples of [the parties'] incompatability," and that "[w]hen the mutual purpose of the venture…ended, the reason for ExecuCorp ended as well," concluding that the "most direct way to solve the impasse is to dissolve the corporation." (*Klingerman v. ExecuCorp, LLC and Bradley E. Parker* (*In re Klingerman*), Adversary Proceeding No. 08-00017-5-JRL, Order Regarding Cross Motion for Summary Judgment (Bankr. E.D.N.C. August 4, 2009)). In support of summary judgment for the defendant, Judge Small concluded that the "[debtor] left the state and left the responsibility of running the corporation to [the defendant]" and that the "undisputed evidence does not support a finding of breach of fiduciary duty." *Id.* Without a finding of breach of fiduciary duty, there was "no evidence on which to base a claim of unfair and deceptive trade practices." *Id.*

ExecuCorp was subsequently dissolved, and the debtor's interest sold to the defendant with approval by this court entered by an order dated April 8, 2010. The debtor's interest in ExecuCorp was sold for $412,250.00, constituting an effective sale of the real property owned by ExecuCorp for a net sale price of $824,500.00. In that order, the court decreed that the $412,250.00 amount would be deposited with a receiver and held in escrow, with the court also retaining jurisdiction to determine the distribution of any proceeds received by the receiver with regard to remaining claims or issues between the parties regarding the LLC, including payment and priority of any "offset" or LLC claims asserted by the defendant in connection with the dissolution of the LLC.

The Court entered an order on April 22, 2010 requesting each party to "file a precise statement of its monetary claims, together with supporting documentation, simultaneously by the close of business on May 5, 2010." The parties have each filed their respective memoranda laying out their claims and this court held a hearing on this matter on October 21, 2010.

## DISCUSSION

This court is now left to determine whether any of the following claims between the debtor-plaintiff, defendant and ExecuCorp result in any credit or set off to either party. The court will address each claim individually, to be followed by a final accounting of amounts due.

### I. First Citizens Bank Mortgage

ExecuCorp financed the purchase of the building at 401 W. Martin Street by executing a promissory note in favor of United Carolina Bank, secured by a deed of trust to the same. That mortgage was subsequently refinanced with First Citizens Bank. The remaining loan balance amount of $159,671.40 was satisfied when the W. Martin Street building was sold and the debtor's interest purchased by the defendant. Under the operating agreement signed by both the debtor and defendant at the time of formation of ExecuCorp, the debtor and defendant were each 50% member-managers. As such, and as each have agreed in their respective memoranda, each member-manager was responsible for 50% of this payoff amount, or $79,835.70. Because the mortgage balance and the members' respective liabilities have already been satisfied, there is no need for further adjustment to the debtor's funds being held in escrow.

### II. First Citizens Bank Fees

The defendant claims he is entitled to a credit in the amount of $1,963.43 for bank fees charged by First Citizens Bank in perfecting its proof of claim. In response, the debtor contends that

"Mr. Parker has failed to provide any supporting documentation showing that First-Citizens Bank & Trust Company incurred any legal fees in filing its Proof of Claim or that any additional amounts are due other than the mortgage." The receiver appointed in this case stated at the hearing that $161,634.82 was paid to First Citizens as the payoff amount for the mortgage. This total clearly includes the $159,671.40 principal and interest amounts, plus a $1,963.43 bank fee. Because this fee was added to the outstanding loan balance and subsequently paid in satisfaction of that loan, it was an expense of ExecuCorp. As stated above, it has been settled that the debtor and defendant were each 50% member-managers of ExecuCorp. As such, they were each responsible for 50% of this expense. This claim has already been paid so there is no need for further adjustment in favor of the debtor or defendant.

### III. Receiver's Fees and Commission

#### A. Receiver's First Application For Fees

The receiver appointed in this case submitted an application for counsel fees and expenses in the amount of $7,301.70. Debtor and defendant both agree that they should each bear 50% of the cost associated with this fee. Therefore they each owed $3,650.85 for this expense which has already been paid. There is no need for further adjustment in favor of the debtor or defendant.

#### B. Receiver's Second Application For Fees

The receiver appointed in this case submitted a second application for counsel fees and expenses in the amount of $13,525.92. Although the defendant contends that these fees should be apportioned to the party which necessitated the work performed, these expenses related to the winding down of the LLC and as such, they are an expense of the LLC. Because the debtor and defendant were each 50% member-managers, they were each responsible for 50% of this expense.

9

This claim has already been paid so there is no need for further adjustment in favor of the debtor or defendant.

### C. Receiver's Third Application For Fees

The receiver submitted a third application for counsel fees and expenses in the amount of $6,175.00. This application has been approved by the court and the debtor and defendant will each share 50% of this expense, or $3,087.50, to be paid out of funds remaining in the receiver's LLC bank account as described below.

### D. Receiver's Commission

The receiver submitted an application for a commission fee in the amount of $23,737.50 which was calculated according to applicable state law. In response to this amount, the defendant offered the debtor a substitute calculation to be used in establishing an alternative commission fee. The defendant's formula involved capping the total commission at 2.5% of one-half the sales price of $825,000.00. This figure would then be split evenly among both debtor and defendant. According to defendant's formula, the receiver's proposed commission would have been $10,312.50, to be divided evenly between the debtor and defendant, for respective amounts of $5,156.25. Because the debtor refused defendant's formula and instead opted to be responsible for 50% of the $23,737.50 amount, or $11,868.75, the defendant now claims he is due a credit for the amount by which the $11,868.75 figure exceeds the amount he [defendant] proposed. The difference between $11,868.75 and $5,156.25 is $6,712.50. While there has been no explanation offered as to why the debtor would choose to pay an additional $6,712.50, the debtor has no duty to mitigate in these circumstances and it is within his discretion to opt for the larger fee, which he has done in this case. The defendant is not due any extra funds, nor should the debtor be penalized,

simply because the debtor rejected the proposed formula. The debtor and defendant were each responsible for 50% of the $23,737.50 receiver commission, or $11,868.75. This claim has already been paid so there is no need for any further adjustment in favor of the debtor or defendant.

### E. Receiver's First Application For Professional Fees for Appraisers

The debtor and defendant both agree that the receiver's first application for professional fees in the amount of $5,055.92 were to be split evenly, for respective amounts of $2,527.96. This claim has been paid so there is no need for any further adjustment in favor of the debtor or defendant.

### F. Receiver's Second Application For Professional Fees for Appraisers

The receiver submitted a second application for professional fees in the amount of $1,500. The defendant is asking the court to grant a credit in his favor in the full amount of this application. The defendant argues that these set of fees would not have been incurred if the debtor had not challenged the W. Martin Street property sales price, thus prompting an additional appraisal and expense incurred by the receiver in preparing for a contested hearing at which the debtor abandoned his challenge. Once again, this was an expense borne by ExecuCorp. The LLC, in turn, operates according to its operating agreement which clearly states that the debtor and defendant are each 50% member-managers. As such, each was responsible for 50% of this cost, or $750.00. This claim has already been paid so there is no need for any further adjustment in favor of the debtor or defendant.

### G. "Paid-in Capital"

The debtor and defendant have agreed that all parties were "even" in terms of financial obligations to ExecuCorp as of September 2006. The debtor ceased making his required payments to ExecuCorp beginning October 2006. As a result, there remains to be a complete accounting for funds due ExecuCorp by the debtor for the period of debtor's absence. The debtor and defendant

11

have both submitted their versions of the proper accounting of ExecuCorp's expenses, rents and amounts due ExecuCorp by the debtor for the period since October 2006. What the debtor did not pay from October 2006 forward, which the defendant was left to contribute on behalf of the debtor, is referred to by the parties as "paid-in capital."

The debtor and defendant were each 50% member-managers of ExecuCorp, and as such each was responsible for contributing to one-half of ExecuCorp's expenses. These amounts were to be offset by any rents being paid to ExecuCorp from rentals and leases of the W. Martin Street property. The figures submitted by the debtor and defendant are identical with respect to the mortgage payments, electric bills, taxes and other expenses, such as repairs, receiver fees, accounting fees, etc. The figures differ in the incoming rent amounts and the management fee paid to the defendant for maintaining the property in the debtor's absence. The court's accounting of these differing amounts is provided below.

### i. Incoming Rents

The defendant's accounting shows the debtor's amounts due being credited with rents received by ExecuCorp from renters in the downstairs portion of the building when the downstairs was in fact being rented. These rents do not include rents being received from the upstairs portion of the building. For those time periods where there were no renters for the downstairs portion, no rents are credited to the debtor in the defendant's accounting, even though the upstairs portion of the building was being rented and rents were being paid to ExecuCorp for the upstairs portion. The defendant argues that because each member-manager agreed to take separate portions of the building, then only rents from a member-manager's portion of the building should go to offset that member-manager's amount due ExecuCorp for expenses. This was the course of dealing between

the parties prior to the business relationship disintegrating. Defendant's argument, however, is once again an attempt to ignore the operating agreement and instead equate respective portions of the building to respective obligations to ExecuCorp. The operating agreement and the previous opinions of this court could not be more to the contrary. The debtor and defendant were each 50/50 member-managers of ExecuCorp. There is no other written agreement between the parties other than the operating agreement. This court will not entertain the suggestion that the operating agreement should not control and instead be replaced by a contrary and inconsistent course-of-dealing. The fact that the parties never amended their operating agreement nor had the foresight to establish a contrary set of operating terms should the business relationship fail does not diminish the reality that the operating agreement has always been the controlling set of terms governing the LLC. This means that all rents, regardless of from which portion of the building they were derived, should have been paid to ExecuCorp to serve as an offset against all contributions required by the member-managers. The parties have asked this court to settle this credit and offset dispute, and this court will do so by applying the plain language of the operating agreement. In this respect, the debtor's accounting of "paid-in capital" is correct because it calculates the amount owed by the debtor by taking into account all rents received by ExecuCorp, not just those from the downstairs portion.

### ii. Management Fee

The debtor and defendant agreed, prior to the debtor leaving North Carolina, that the defendant should receive a management fee for maintaining the W. Martin Street building. Beginning January 2007, after the debtor abandoned the LLC and the state, the defendant unilaterally increased the monthly management fee paid to him from $100 to $500. The defendant justifies this by arguing he was left to tend to broken windows, broken doors, broken locks,

landscaping, paying taxes and other bills, and securing tenants for the building. Given the fact that the debtor moved to Oregon leaving these responsibilities to defendant, it seems only equitable that the defendant be compensated with a reasonable fee. The amount of $500 a month is reasonable given these circumstances and that amount should be credited to the defendant for the period January 2007 through August 2009. A receiver was appointed to take control of ExecuCorp in September 2009 so there appears to be no reason why the defendant should have received a management fee after that point in time.

### iii. Final Accounting of "Paid-In Capital"

To reflect the debtor's correct amount owed to, or owing from, the LLC, the figures submitted by the parties need to be readjusted to take into account all rents received during the period October 2006 through July 2010, a management fee of $100 to defendant for October 2006 through December 2006, a management fee of $500 to defendant for January 2007 through August 2009, as well as all mortgage costs, utility bills, receiver fees and other agreed upon expense amounts contained in the parties' submissions. Taking these factors into account, one-half of the total expense amount of ExecuCorp from October 2006 through July 2010 is $110,687.80, and one-half of all rents received by the LLC for the same period are $113,625.00. The rent amount is greater than the expense amount by $2,937.20, meaning one-half of total income to the building owned by the LLC exceeded the debtor's required contribution to the building. This figure flowed into the Receiver's bank account and was used to pay the expenses of the LLC. There is no basis for adjustment to the funds held in escrow for the debtor nor is there any credit due the defendant.

### H.  LLC Bank Account

The defendant asserts that he entitled to a credit because of a previous balance in ExcuCorp's bank account in the amount of $27,250.00.  Because this was an LLC bank account and not a personal account of either the debtor or the defendant, regardless of how the parties treated it, the account was subject to the terms of the operating agreement.  As such, the funds flowed into the LLC and were used to pay its expenses.  The previous balance of this account serves as no basis for adjustment or credit to either plaintiff or defendant.

### I.  Indemnification Claim

The defendant has submitted a claim seeking reimbursement from the debtor in the amount of $41,524.38, representing half of the attorney fees and costs expended for defending against the debtor's breach of fiduciary duty claim.  The defendant bases his claim on sections 5.08 and 7.03 of the Operating Agreement which require ExecuCorp to indemnify managers and make advances for expense to them with respect to matters capable of indemnification under N.C. Gen. Stat. §§ 57C-3-31 and 57C-3-32 "to the maximum extent permitted under the applicable law."

N.C. Gen. Stat. 57C-3-31(b) states:

> "Unless otherwise provided in the articles of organization or a written operating agreement, a limited liability company shall indemnify a member, manager, director, or executive who is wholly successful, on the merits or otherwise, in the defense of any proceeding to which the person was a party because the person is or was a member, manager, director, or executive of the limited liability company against reasonable expense incurred by the person in connection with the proceeding."

The operative terms in this statute are "wholly successful" and "proceeding."

In this case, a complaint was filed by the debtor against defendant on February 11, 2008 seeking to dissolve ExecuCorp, and to recover damages from the defendant for breach of fiduciary duty and for unfair and deceptive trade practices. Judge Small granted summary judgment in favor of the debtor with respect to dissolution of the LLC, and granted summary judgment in favor of the defendant with respect to the claims of breach of fiduciary duty and unfair and deceptive trade practices. It would be difficult to characterize as "wholly successful" a proceeding in which the defendant was successful with his breach of fiduciary duty defense, but failed to prevent a corporate dissolution. The defendant was successful on the breach of fiduciary duty claim, but not wholly successful as to the proceeding. (*See* 1-18 Robinson on North Carolina Corporation Law § 18.03 - "the requirement that the indemnitee be 'wholly' successful precludes any claim for mandatory indemnification based on a partial success, such as dismissal of most but not all claims in a complaint.") The language "wholly successful" supports this conclusion, especially given the ease with which a contrary intent could have been expressed by the legislature by leaving such language absent. (For example, the Delaware Code does not include this "wholly successful" language, instead providing for mandatory indemnification "to the extent that" the director or officer has been successful. Del. Code Ann. tit. 8, § 145(c)).

Given the specific language of the operating agreement and the statute, the defendant is not entitled to indemnification from the debtor or ExecuCorp.

### J. 2009 Tax Preparation Fee

Both debtor and defendant have agreed that each was responsible for 50% of the $500.00 tax preparation fee for 2009. This claim has already been paid so there is no need for any further adjustment in favor of the debtor or defendant.

### K.  2010 Prorated Tax Liability

Per the operating agreement, the tax consequences of the LLC flow to its members.  While the estimated tax liability for the 2010 tax year is $8,800.00, the debtor and defendant have agreed that each will bear responsibility for their respective 50% portion of that liability, whatever that liability may ultimately be.  No further adjustment in favor of the debtor or defendant is necessary.

### L.  Receiver's LLC Bank Account

The receiver appointed in this case currently has $8,135.77 in a bank account he established to carry out his duties as receiver.  This amount will be used to pay the third application for receiver's fees in the amount of $6,175.00.  Following that payment, the account balance will be $1,860.77.  This amount will be further reduced by a refund to the debtor in the amount of $1,481.61 for property taxes paid at the closing of the sale of his interest in ExecuCorp.  This tax payment is the responsibility of the property's current tenant and will be paid by that tenant in 2011.  ExecuCorp should be able to recoup both halves of the payment from the tenant. Following this refund, the account balance will be $379.10.  This amount will be split evenly between the debtor and defendant, or $189.55 to the debtor and $189.55 to the defendant.

### M.  Defendant's Lease Commission

The defendant is asking this court to award him $9,300.00 as a commission for securing a lease for the W. Martin Street property.  Not only is the defendant not a licensed real estate broker, securing leases, seeing to the needs of tenants, and tending to the general needs of the W. Martin Street property were all duties expected to be carried out by the defendant as a member-manager of ExecuCorp. The defendant has been given a reasonable management fee for carrying out these duties and is not entitled to any additional fees or commissions.

### N. North Carolina Secretary of State Fee

ExecuCorp incurred a $1,000 expense with regard to corporate filing requirements with the Secretary of State. As this expense was incurred by the LLC, it was to be shared evenly between the debtor and defendant in the amount of $500 each. This claim has already been paid so no there is no need for any further adjustment in favor of the debtor or defendant.

### O. Debtor's Claim Calculation

The receiver stated at the hearing that he currently holds $330,925.30 in escrow for the debtor as net proceeds from the closing of the sale of his interest in ExecuCorp. This amount should be disbursed to the debtor, plus $1,481.67 as a refund for the tax deducted from his proceeds at closing, plus $189.55, which is 50% of the remaining balance in the Receiver's LLC bank account following deductions described above. The total amount to be disbursed to the debtor is $332,596.55. The remaining $189.55 should be dispersed to the defendant.

### CONCLUSION

While the parties alleged during the course of these proceedings that adjustments and credits were due the debtor and defendant based on their prior relationship, this court ultimately finds, as the accounting provided above makes clear, that the operating agreement ultimately controls. All obligations other than the Receiver's final fee discussed above have been paid, either out of revenue of the LLC or by the Receiver at closing. No further adjustment or credit is due the debtor or defendant, other than the liquidation of the Receiver's bank account as directed herein.

"END OF DOCUMENT"